Good morning. My name is Margaret Cates. I am an assistant federal defender in the Albuquerque, New Mexico office, and I'm representing the appellant, Jeremias Robertson. We raised a number of issues in our briefs, but I'd like to focus on two issues this morning. I'd like to talk about the district court judges commenting on Mr. Robertson's silence and the need for a clear and convincing evidentiary standard when the contested enhancements caused such a dramatic and extraordinary three-fold increase to the guidelines. So what specifically happened in this case, the district court commented on Mr. Robertson's silence at the sentencing hearing. And it was clear that his comments were part of his deliberations. The Supreme Court made clear back in 1999 in the Mitchell case that an individual has a right to remain silent, and that right to remain silent continues through the sentencing. But let me ask you a hypothetical question. Let's say, well, just in the context of this argument, let's just say I say something like, well, it's true, isn't it, that he didn't testify in his own defense? And we ask a series of questions over the next 30 minutes, and then I go back and I realize, well, you know, really that has no legal effect. That Mitchell case would preclude me from taking that into consideration. And so then when we write the opinion, we realize that. And now why would a question that is posed, why would that necessarily have any bearing on the ultimate decision? Because when the district judge ultimately made the decision, there was no reference, at least that you've criticized, about an adverse inference from the defendant's invocation of the right to silence. Your Honor, I think context is everything in this case, and so we have to look at the . . . let's look at the conversation between the district court and myself. And so I think that that's what's important. Well, what you said is not evidence. Excuse me? What you said to the district court was not evidence. No, it was not evidence. Well, when the court gets ready to make and to impose his sentence, he looks at what the evidence was. And if there was no evidence from any source, including your client, where is the harm? There was no evidence. Let me answer your question. So what is evidence? Evidence is the testimony of a witness. It's the cross-examination of the witness. There was another witness that testified, an eyewitness. There were video recordings on a lapel of the officer. All of that is evidence. Of course, but your statements are not evidence. Your dialogue with the district court . . . I'm not saying they're evidence, Your Honor. I'm saying that that gives you some insight into how he was thinking. And that he was, in fact, considering the fact that my client didn't testify. No, he was considering the fact that there was no contrary evidence to the unrefuted officer testimony. Your Honor, may I just read you? Because he specifically says, just if I may, because I think that's extremely instructive. He doesn't specifically say the words, I am going to use your client's silence against him. But he all but says that. And we have to look at his words, because it is instructive as to what he was thinking about. I referred to the officer who had testified. I said, he's trigger-happy, violent, and disrespectful. And the court responded, you know, I'm very disturbed about the sequence of events occurring so rapidly, yes. And then I say, exactly, especially given his history, I'm a little bit surprised he's still on the police force. He seems like a liability. And then the court says, I have some serious questions about him, frankly. But didn't he say the evidence supports it in this situation? Then right after that, you're correct, he says, but I think his testimony is supported in this case. And then, so he's talking about his concerns about the police officer, right? He's clearly expressing he has doubts and concerns. And then right after that, he says this, I'm a little surprised that I didn't hear from the main player, who would tell us that, no, I did not point a gun at Officer Adias. I didn't hear that testimony. Well, isn't that the issue, counsel? I mean, you can't just say that if the judge says, well, there's no evidence of that, that he's imputing to him the silence of the defendant. Come on. I mean, you've got to try a case with facts and evidence. And the judge at that point said there's no contrary evidence. He's supported. I would have thought I would have heard something. Your Honor, I think what's important is, if he had said, the government presented this very strong evidence, and there's nothing to refute it, and I find that the government has met their burden. That's one thing. That's not what he said. What he said was, he was surprised that he didn't hear from my client. And then, when I responded to him, he cut me off and argued, again, saying he didn't say anything under oath. That's a comment on his exercise of his constitutional rights. He had my client in a position where either he had to eat the enhancement or he had to give up his constitutional rights. He specifically was talking about that. I don't think we can overlook that and just say, oh, he was just looking at the fact that the government presented evidence. Well, you could make the same exact argument if he had said what you initially said he should have said. I don't think, I don't agree. You could have. It certainly is correct. There still would have been no evidence, and there still isn't any evidence. There was evidence, Your Honor. And he went through the evidence. There was an eyewitness that we put on, who he called honest. And he just said that he believed that, at that moment, that the cop shot my client, that, at that very moment, my client looked north. He said he found him to be honest. He took that as evidence. He looked at the evidence. And I'm not trying to cut you off, because there's a lot of pieces to your answer. And just if we take what Mr. Pinson said, Mr. Pinson also acknowledged that he didn't see the defendant's right hand, where the officer said that he was holding the gun, right? Your Honor, what Mr. Pinson said that, and you can see that in the videos, as he's walking down the street, all he has in his hand is either an iPod or a phone, listening to music. And that's clear. And then, when he's in the parking lot, Johnny Pinson says he does see both his hands, and he never sees a gun in his hand. He says that, when the conversation is between the officer and, according to the officer, that he's saying, at that point, that's when he says that my client has his back to him, he's reaching over his shoulder, and at the same time pleading for his life, don't shoot me, don't shoot me, I didn't do anything. That's when he gets shot. So Johnny Pinson sees all that. He sees him, I just want to make sure I get the facts right. He sees him, that he's listening to music, I think he says, but then he continues to walk down the street, and at the point that the officer says he sees the barrel pointing at him, at that point, am I mistaken that Mr. Pinson specifically acknowledged that he didn't see his right hand? I believe that Mr. Pinson says that he can see his hands, because he says, when the officer says, the officer doesn't say, drop the gun, which was one of the arguments that would only make sense. He says, show me your hands, show me your hands, and Johnny Pinson says that he sees my client put his two hands out to the side, and at that point, he says that he does not see a firearm. He says that he puts both his hands out. But if I may, I'm not arguing over what all the facts were, and how the court weighed the facts. That's not my argument. I am saying, though, there was evidence that he had a way. The issue is that he inappropriately and unconstitutionally looked at and focused on the fact that my client didn't take the stand. Why would a court say, frankly, I'm surprised I didn't hear from the main player that would tell us that, hey, I didn't point the gun at the officer, at officer audience, I didn't hear that testimony. And then when I tried to explain to him, it's a contested sentencing hearing, and that from my objections, and from my sentencing memo, and through my cross-examination, that's exactly what we've been saying. And then the court cut me off and said, but he hasn't testified that under oath. So what he's saying is, unless I hear that under oath, I don't know how to weigh the evidence, which would leave me in my second point, which is exactly the problem with the preponderance standard. He was clearly struggling. OK, before you go to that argument, I just want to focus on this argument. What if we were to interpret, what if we were to say that, well, it is susceptible of the interpretation the defense counsel has given. It's also susceptible reasonably of an interpretation that the district judge was simply saying what Judge Kelly is intimating, and that is that the judge, that was his way of saying, I don't think that there's any contradictory evidence to dispute the officer's version. When he sees a barrel pointing at him, you see this homeless man sitting in the corner, that there's testimony from him, but that there's nothing to contradict, to explicitly contradict what the officer said, and so it's undisputed testimony. And so if it is ambiguous, and if we do say that the plain error standard applies, how do we say that the statement itself was capable of two reasonably different interpretations? So I think there are two answers to that, Your Honor, because you're talking about plain error standard. And what I would say under that is if the court said, yeah, it is error to comment and make an adverse inference from a defendant's failure to testify at a sentencing hearing, that's error. And it's plain, because that's been clear since 1999 in Mitchell, as well as cases that the Tenth Circuit has ruled on. And in fact, Your Honor, I believe that you authored a case recently, the Gonzalez case, which had fairly similar issues, in which the court said that it was clear that it's the government's burden alone to prove the sentencing guideline 3A1.2, which is what we have here. And in that case, it was the same district court. Used the enhancement in part because the accused hadn't, quote unquote, hadn't presented evidence to counter the application. And this court found that that ruling was unsound. It held that an accused did not need to present any evidence. The burden of proof fell on the government to trigger the enhancements. And so rather than deliberating on a silence, which clearly he was doing in Mr. Robertson's case as well, this court said the court should have examined whether the defendant's individual rights. And so I think that's the problem. Even if you say it's ambiguous, and the government conceded that it could be ambiguous, he took into consideration his constitutional rights. And there's no ambiguity about that. He didn't say, you know, I'm looking at all the evidence, and I feel like the government has met their burden. Exactly what this court said in Gonzalez. The government's met their burden. We could argue whether or not the government met their burden. But what I'm saying is, he didn't say that. He specifically said, from his statements, very clear, he was suggesting that my client should have testified. That would be the only thing that he was going to. And that's really the line. Is it enough to suggest, or does the court actually have to say, you did not testify, and I'm holding that against you? I mean, that is an easy case, and that's Mitchell. Right. And that's extreme. And obviously, I don't actually think this is that far from Mitchell. He didn't say the exact words, but there aren't magic words. We can see from the context, and we can see from the content of his statements what he was thinking of. And in fairness to the court, I think the court was struggling. The court specifically said he was troubled by what Officer Arias said about his disciplinary history, about all that. And in the context of talking about how he was troubled by that, that's when he said, and your client didn't testify. And that's my concern, because I think with the clear and convincing standard, which this court has recognized that in cases of extreme or dramatic increases in here, it was threefold. It was literally almost threefold. I think if the standard of proof had been what it should have been, I really believe the court would have reached a different decision. How do you get around Washington? US versus Washington. I know we have a couple of opinions that you recited saying it's an open question. I don't know why they said it was an open question. Washington seemed to have answered it. Because what Washington specifically said is it said that with respect to an ordinary case, whether or not a preponderance is the appropriate standard, that door is closed. That's what that said. But I think the important thing to focus on is what it talks about was the ordinary case. And all the other cases, many other cases that we cited, for example, Ray and Olson, those cases decided by this court also recognized preponderance of the Evington ordinary case, but said over and over again that an individual would be entitled to increased protections when there's an extraordinary or dramatic increase threefold. And the cases refer to the tail wagging the dog. And it's so true. And the last thing I'll say, because I say I only have 20 seconds left, is it's just patently unfair that we demand the highest standard of proof for a case, proof beyond a reasonable doubt, to convict somebody. But then, in an uncharged crime that triples the sentence, we demand the lowest standard of proof of a preponderance. And it's just, it's patently unfair. And I think this is the perfect opportunity for the court to clarify that. Thank you. HOWARD THOMAS. Good morning. May it please the court. I'm Howard Thomas. I'm here to represent the United States of America. Felon in possession cases, 922G1 cases, run the gamut from the relatively innocuous case where the defendant, absent-mindedly perhaps, sticks the loaded gun in her or his nightstand and leaves it there to be discovered at some later point, goes out for the night and puts it in her purse or in his pocket or in the glove compartment of their car. And it doesn't come out during the evening, all the way to the situation on the other end of the continuum, where the defendant, unlawfully possessing a loaded gun, takes it out, points it at people, and ultimately points it at a law enforcement officer, not once but twice. That's the other end of the continuum. And that's the case that we have here today. And let me just talk to you about the facts of the case, because they are important, the particular facts. In this case, Judge Parker determined, first of all, that the 911 call, which reported a man meeting Mr. Robertson's description, was waving his gun around randomly at people in downtown Albuquerque. Judge Parker found that call to be credible. Officer Arias was the first officer to respond. And as he approached Mr. Robertson in his patrol car, his marked patrol car, while wearing a uniform, he saw that Mr. Robertson had caught sight of him. And Mr. Robertson quickened his pace, went behind a tow truck on one side of the first street. And Officer Arias sped to that area, got out of his car, shouldered his rifle. He understood that the 911 call did refer to a person with a gun meeting this person's description. And you can see from, this is really important, and Judge Parker commented on it. You can see from video surveillance from a neighboring business that almost immediately after Officer Arias gets out of his car, he ducks. This is not a rehearsed motion, obviously. It's exactly the kind of action that one would expect to be taken by someone at whom a gun is being pointed. Or where he's heard that there is a gun present. I mean, you just get behind whatever you can just in case. Yes, Your Honor. Although he did say that he immediately did see Mr. Robertson with what he believed was a gun. This was an August afternoon, clear afternoon. And the barrel pointed at him. He took cover behind a car. And again, you can see him almost immediately ducking. He then regained sight of Mr. Robertson. This is after telling him twice to show me your hands. Counsel has argued that maybe show me your hands wasn't the exact verbiage that should have been used. You can see from the evidence that this happened in a matter of seconds. It was a highly charged situation. I don't think that Officer Arias had the time to come up with maybe more precise verbiage. But he shouted, show me your hands twice. Regained sight of Mr. Robertson. Mr. Robertson again turned around towards his left, pointed his gun, holding the gun in his right hand at Officer Arias. Officer Arias had commanded him twice more to show me your hands. And Officer Arias decided there was no alternative but to place a shot. And he knocked Mr. Robertson down. And fortunately, Mr. Robertson survived. Now, one thing that's beyond dispute, besides what I've told you, is that Mr. Robertson had a loaded gun. He pled guilty to felon in possession of a firearm and ammunition. So there's no quibbling about that. It was found two or three feet from him when they approached him. That's correct, Your Honor. In fact, one can hear on the body cam Officer Arias yelling at Mr. Robertson when Mr. Robertson's on the ground to get away from the gun, don't touch the gun. He's concerned that Mr. Robertson is crawling, trying to reach the gun, and doesn't want that to happen. So those are the facts. Now, you've heard about Mr. Pinson, who was the only witness called by the defense at sentencing. We called Officer Arias and the detective who investigated the officer-involved shooting. Those were our witnesses. And we presented imagery, as I say, from body cam and neighboring businesses. The only witness called by the defense was Mr. Pinson. Mr. Pinson was a person who happened to be in the area. And surveillance video in evidence shows him sitting down next to a building across the street from this incident, reading a book. But Mr. Pinson, when he testified, said that he stood up immediately as soon as Officer Arias raced up in his car and stopped and got out. The video imagery clearly shows that he did not. Well, let me ask you this question. Because I don't hear opposing counsel saying that the district judge couldn't have made the very finding that he did. But the question is, did the district judge rely on all of this stuff? And even if the district judge did rely on all of this stuff, did the district judge also rely on the fact that Mr. Robertson invoked his right not to testify? And so even if we credit your interpretation of Mr. Pinson's testimony, the video testimony or the video evidence, what do you say to opposing counsel's argument that the district judge also specifically said that the court was going to rely at least in part of the fact that Mr. Robertson didn't hear anything from Mr. Robertson? What's wrong with that argument? Your Honor, to answer the first part of your question first, certainly it's clear from the record that Judge Parker carefully parsed and discussed all the evidence that I've discussed to your honors this morning. Secondly, what Judge Parker said was that essentially that he was surprised that Mr. Robertson didn't testify. Well, he also said I didn't hear any of that. I was surprised as well. I think everybody who was in that courtroom, perhaps other than defense counsel and Mr. Robertson, were surprised that Mr. Robertson didn't testify. What the defense did was they made a strategic decision, which they were entitled to do, which is I'm not going to call Mr. Robertson to testify. I'm going to call Mr. Pinson and rely upon my efforts to discredit Officer Arias due to his disciplinary history. They're entitled to make that kind of a strategic decision. Is the district court entitled to say, well, the officer has a lot of very incriminating things in his personnel file. Based on that, I have serious doubts about his credibility, but I didn't hear Mr. Robertson take the stand, and so I'm going to reject the objections to 7889 of the pre-sentence report. Is Judge Parker entitled to do that? No, Your Honor. Well, what's the difference between that scenario and saying, well, I didn't hear any of that when opposing counsel was making her argument? Here's what Judge Parker did. Judge Parker discussed the evidence. He actively engaged with the witnesses and so forth. And he didn't say that he found that the government had met its burden because Mr. Robertson didn't testify. He said that he found that the government had met its burden because, although Officer Arias' background was troublesome to him, and he was concerned about that, that Officer Arias' testimony was corroborated. And it was. It was corroborated by the objective. That's what Judge Parker said, that I found that it was corroborated. He didn't say because I didn't hear anything to counter that? He said that he found it to be supported. I believe that's his exact words. And in fact, it was. And I've alluded to that evidence in our discussion this morning. And so getting back to what Judge Parker said about being surprised, this is a completely different situation than Mitchell. I mean, we can all agree with that. In Mitchell, the district judge specifically said that I'm going to hold your silence against you and did. In this situation, there's nothing to indicate that Judge Parker made an adverse inference of any sort. He simply noted there's an absence of rebuttal testimony. This is what I have to work with. I have Officer Arias' testimony. I did have concerns about him, but I found his testimony to be supported. And I find that Mr. Pinson, even though he's a nice fellow and well-intentioned, couldn't and didn't see what he said he saw. He was looking at a book or sitting down or whatever. In other words, the video showed that Mr. Pinson couldn't have seen what he said he saw. And that's the sole basis for his expression of surprise. He's weighing the evidence and determined that the government had met its burden. Because the defendant didn't testify. Because there was no evidence. Because there was no evidence. Whether or not the defendants had testified. I guess we're looking at implicit reliance on silence. I think that here, counsel's discussion over the Gonzalez case, which is a recent decision from this court, is instructive. That case involved exactly the same victim-related adjustment as this one. In that particular case, the government did not present evidence of the defendant's subjective intent to commit an assault. That's not an issue in this case. And so in the Gonzalez case, the question was, the government not having presented sufficient evidence to sustain its burden to prove every element of the victim-related adjustment, was it up to the defendant to disprove it? That's not what we have here. Isn't it?  What we have here is the government met its burden. We've heard from the officer. We've heard from Mr. Pinson. And that's what I have. But I don't have what the defendant would say. That's correct, Your Honor. This is somewhat similar to the United States versus Constantine case. You familiar with that case? Yes, Your Honor. Yes, and I agree. I, you know, this was at the very worst. It's an innocuous comment, but it's a true comment. I was surprised that the defendant didn't testify. If I've got a minute and 15 seconds, can I just cover quickly the preponderance, the evidence issue? Yes, please. And again, this is in our briefing. But you know, it's time, with all respect, Your Honors, to put this issue to bed so that it doesn't keep coming up time and time again in this court. The Ninth Circuit is the only circuit that has composed a six-part test to determine whether an enhanced standard of proof should be used. One of the elements is that they look at whether the enhanced sentence falls within the maximum sentence. Well, if it falls outside the maximum, then of course it's an invalid sentence. Whether the enhanced sentence negates the presumption of innocence or the prosecution's burden of proof, that can never happen because the defendant's not going to get the sentencing unless and until he or she is found guilty by plea or after trial. It makes no sense to add yet another epicycle to our sentencing process. We're going to continue to spawn a cottage industry of appeals based upon a standard of proof necessary to find sentencing facts. The preponderance of evidence is more than in the light of Booker. Thank you. Thank you very much, Your Honors.